C. L. GILLIKIN v. ATLANTIC & EAST CAROLINA RAILWAY COMPANY AND SOUTHERN RAILWAY COMPANY.

(Filed 7 July, 1961.)

**1. Carriers § 6½—**

Where the Interstate Commerce Commission imposes certain conditions solely upon the carrier acquiring control of another carrier through capital stock ownership, only the purchasing carrier is liable to the employees upon the stipulated conditions, and nonsuit is properly allowed as to the other carrier in an employee's action against both carriers to recover compensation due him under the conditions.

**2. Appeal and Error § 38—**

Assignments of error not set out in appellants' brief and in respect to which no reason or argument is stated or authority cited will be deemed abandoned. Rule of Practice in the Supreme Court No. 28.

**3. Carriers § 6½—**

Where the Interstate Commerce Commission approves the acquisition of control of one carrier by another through capital stock ownership, it is required to impose a fair and equitable arrangement to protect the interests of the railroad employees affected. 49 U.S.C.A. 5(2).

**4. Same—**

Where the Interstate Commerce Commission approves the acquisition of control by one carrier of another carrier through capital stock ownership, upon conditions that any employee of either carrier should be compensated for a stated period of time for loss of employment resulting from such employee being put in a worse position with respect to his employment by reason of the acquisition of the control, it *is held* that an employee is entitled to recover upon such conditions regardless of whether his loss of employment is due to the abolition or consolidation of jobs or to the use of modern and improved facilities, requiring fewer employees to do the work.

GILLIKIN v. R.R.

**5. Courts § 19—**

The courts of this State have jurisdiction of an action by a railroad employee to recover upon conditions imposed by the Interstate Commerce Commission for the protection of employees from loss of employment resulting from the merger of carriers or the acquisition of one carrier by another, there being nothing in the record to show the matter is in the purview of an exclusive arbitration of agreement.

APPEAL by defendants from *Joseph W. Parker, J.,* October Civil Term 1960 of LENOIR.

Civil action brought by plaintiff, a former employee of Atlantic and East Carolina Railway Company, against Atlantic and East Carolina Railway Company and Southern Railway Company to recover damages for loss of employment, the cause of action being based upon certain conditions in favor of employees imposed upon Southern Railway Company by the Interstate Commerce Commission as conditions to its approval and authorization of Southern Railway Company's application to acquire control of Atlantic and East Carolina Railway Company through capital stock ownership of the latter.

A jury was duly chosen, sworn and impanelled to try the issues arising on the pleadings. While the defendants were offering testimony, "the parties agreed that a juror be withdrawn and a jury trial waived and that the Judge be authorized to answer the issues with the same force and effect of the verdict of the jury." Whereupon, the judge "upon all the evidence offered, being of the opinion that each of the issues submitted should be answered as follows, finds the facts to be and answered the said issues as follows":

"1. Was the plaintiff, as an employee of the defendant, Atlantic and East Carolina Railway Company, put in a worse position with respect to his employment as a result of the acquisition of control of the defendant, Atlantic and East Carolina Railway Company, by the defendant, Southern Railway Company, through the acquisition of stock?

Answer: Yes.

"2. Was plaintiff's job, as an employee of the defendant, Atlantic and East Carolina Railway Company, abolished on October 4, 1957, as a result of the acquisition by the defendant, Southern Railway Company, of the Atlantic and East Carolina Railway Company, through the acquisition of ownership of stock?

Answer: Yes.

"3. Was the plaintiff, as an employee of the defendant, Atlantic and East Carolina Railway Company, put in a worse position with respect to his employment, or was his job as an

employee of the said Company abolished on October 4, 1957, as a result of a unification, consolidation, merger or pooling of previously separate facilities, operations or services of Atlantic and East Carolina Railway Company and Southern Railway Company?

Answer: No.

"4. What amount, if any, is plaintiff entitled to recover of the defendant, Atlantic and East Carolina Railway Company?

Answer: $508.20.

"5. What amount, if any, is plaintiff entitled to recover of the defendant, Southern Railway Company?

Answer: $508.20."

From judgment entered that plaintiff recover from defendants, jointly and severally, the sum of $508.20 and the costs, both defendants appeal.

*Jones, Reed & Griffith for plaintiff, appellee.*
*Joyner, Howison & Mitchell and John G. Dawson for defendants, appellants. Of counsel for appellants: Henry L. Walker, R. Allan Wimbish and James I. Hardy.*

PARKER, J.  Prior to 12 February 1957 Southern Railway Company, hereafter called Southern, applied by petition to the Interstate Commerce Commission under Section 5(2) of the Interstate Commerce Act, 49 U.S.C.A., Section 5(2), for authorization and approval of the acquisition by it of control of Atlantic and East Carolina Railway Company, hereafter called Atlantic, through ownership of the latter's capital stock.

The Interstate Commerce Act, 49 U.S.C.A., Section 5(2), provides that it shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph for two or more carriers to merge, or for any carrier to acquire control of another through ownership of its stock or otherwise, etc.

Section 5(2) (f) provides in relevant part: "As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position

with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order."

The Interstate Commerce Act, 49 U.S.C.A., Section 5(9), provides: "The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (7), of this section, as it may deem necessary or appropriate."

The parties stipulated: "Order of Interstate Commerce Commission in 'Finance Docket No. 18698, Camp Lejeune Railroad Company, et al, Securities and Operation, etc.,' (295 I.C.C. Finance Reports 511), authorizes the acquisition by the defendant, Southern Railway Company of control of the defendant, Atlantic and East Carolina Railway Company, through the acquisition of stock, was entered on February 12, 1957, and became effective fifteen days thereafter, or on February 27, 1957."

The Interstate Commerce Commission in its order in Finance Docket No. 18698, Camp Lejeune Railroad Company, et al., Securities and Operation, etc., 295 I.C.C. Finance Reports 511, approving and authorizing, subject to prescribed conditions, acquisition by Southern of control of Atlantic through ownership of capital stock of the latter, says in relevant part: "Under section 5(2) (b) of the act, it is our duty to find, among other things, that the proposed transaction is consistent with the public interest, and, as we deem necessary, we may make our approval subject to whatever modifications of the proposed terms and conditions we find just and reasonable. . . . At the hearing, organizations representing employees of the Coast Line and the East Carolina had been permitted to intervene. Although they objected to the granting of the application because of the detriment to the carrier employees that allegedly would result, the objections on account of the East Carolina employees were withdrawn in view of the Southern's statements that they would agree to the imposition of the so-called North Western conditions. While there has been no showing of adverse effect on employees of the carriers directly involved in the transactions, nevertheless, as is customary in instances of approval of transactions under section 5(2), we will make our approval herein subject to the imposition of the same conditions for the protection of adversely affected railway employees as were imposed in Chicago & N. W. Ry. Co. Merger, 261 I.C.C. 672."

The parties further stipulated that for the purposes of this trial the consummation of the acquisition by Southern of control of At-

lantic through ownership of the capital stock of the latter by Southern was made 19 September 1957.

The Interstate Commerce Commission on 29 September 1958 issued a supplemental order in Finance Docket No. 18698, Camp Lejeune Railroad Company, et al., Securities and Operation, etc., which was introduced in evidence by plaintiff as his Exhibit 3, and is as follows:

"Finance Docket No. 18698

CAMP LEJEUNE RAILROAD COMPANY, ET AL.,
SECURITIES AND OPERATION, ETC.

"*It appearing,* That by report and order on reconsideration in the above-entitled proceeding, dated February 12, 1957, 295 I.C.C. 511, the Commission authorized acquisition by the Southern Railway Company of control of the Atlantic and East Carolina Railway Company through the ownership of capital stock, subject to the same conditions for the protection of railway employees as were imposed in *Chicago & N. W. Ry. Co. Merger,* 261 I.C.C. 672;

"*It further appearing,* That by order of the Commission dated July 25, 1958, the Railway Labor Executives' Association was permitted to intervene herein and to file a petition for further hearing, reconsideration, and supplemental order, for the purpose of introducing evidence concerning the adverse effect of the acquisition of such control by Southern Railway Company on the employees of the Atlantic and East Carolina Railway Company and requesting the imposition of the same conditions for the protection of such employees as were prescribed in *Oklahoma Ry. Co. Trustees Abandonment,* 257 I.C.C. 177;

"*It further appearing,* That the Southern Railway Company has filed a reply to said petition in which it admits that since acquisition by it of control of the Atlantic and East Carolina Railway Company employees of the latter have been displaced or otherwise adversely affected in connection with which dispute has arisen between the carrier and the employees involved as to whether they are protected by the prescribed conditions;

"*It further appearing,* That the conditions prescribed as aforesaid for employee protection in said proceeding contain no provision for adjudicating disputes arising with respect to the interpretation of such conditions and the only recourse other than through the procedure here involved is to resort to the courts;

"*It further appearing,* That the Commission's usual practice where it is known that employees will be adversely affected by a transaction such as involved in this proceeding and in the absence

of agreement by the parties to the contrary, is to prescribe the conditions set forth in *Oklahoma Ry. Co. Trustees Abandonment,* 257 I.C.C. 177, which sets up appropriate procedures with respect to the settlement of disputes arising from such conditions; and

"*It further appearing,* That the conditions previously imposed herein are inadequate and impose an unnecessary burden upon employees who may have been or are adversely affected by the transaction, and that such employees should have the benefit of the same procedure for settling controversies with respect to the protection intended to be afforded as usually obtains in cases of this nature;

"*It is ordered,* That the aforesaid petition to the extent that it requests reconsideration and a supplemental order, be, and it is hereby, granted;

"*It is further ordered,* That the aforesaid order on reconsideration dated February 12, 1957, be, and it is hereby, modified to provide that the approval and authorization of the acquisition by the Southern Railway Company of control of the Atlantic and East Carolina Railway Company through the ownership of capital stock shall be subject to the same conditions for the protection of railway employees as were imposed in *Oklahoma Ry. Co. Trustees Abandonment,* 257 I.C.C. 177; and

"*It is further ordered,* That the aforesaid petition for further hearing, reconsideration and supplemental order, except to the extent granted hereinabove, be, and it is hereby, denied."

Apparently, this supplemental order has not yet been issued in a bound volume.

Plaintiff introduced in evidence the decision of the Interstate Commerce Commission on 29 May 1946 in Finance Docket No. 15250, Chicago & North Western Railway Company et al Merger, 261 I.C.C. Finance Reports 672. This decision approved and authorized the merger of the properties of the Escanaba, Iron Mountain and Western Railroad Company into the Chicago & North Western Railway Company for ownership, management, and operation, subject to the following prescribed conditions: "During the period of 4 years from the effective date of our order herein such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this section shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order —"

Plaintiff introduced in evidence the decision of the Interstate Commerce Commission on 17 May 1944 in Finance Docket No. 14221, Oklahoma Railway Company Trustees Abandonment of Operation, Etc., 257 I.C.C. Finance Reports 177. In this proceeding a certificate was issued permitting abandonment of operation in interstate and foreign commerce by Robert K. Johnston and A. C. DeBolt, trustees of the Oklahoma Railway Company of lines of railroad in Oklahoma, Canadian, Logan, and Cleveland Counties, Oklahoma, and a joint purchase by the Atchison, Topeka and Santa Fe Railway Company and Joseph B. Fleming and Aaron Colnon, trustees of The Chicago, Rock Island and Pacific Railway Company, of portions of, and acquisition of, joint trackage rights over a portion of lines of the Oklahoma Railway Company, acquisition of trackage rights by the Santa Fe and Rock Island over lines of each other, and individual purchases by the two said carriers of other portions of the railroad property of the Oklahoma Railway Company was approved and authorized, and conditions were prescribed. The Commission said in its decision: "The proposed abandonment of operation in interstate commerce by the Oklahoma and the proposed purchases, *et cetera,* by the Santa Fe and the Rock Island constitute an inseparable plan for the unification of railroad facilities. Therefore, we must prescribe conditions in accordance with the provisions of section 5 (2) (f) of the act." The relevant prescribed conditions are: "4. If, as a result of the abandonment of operation herein permitted and the purchases et cetera, herein authorized, hereinafter referred to as the transaction, any employee of Robert K. Johnston and A. C. DeBolt, trustees of the Oklahoma Railway Company, of The Atchison, Topeka and Santa Fe Railway Company, or of Joseph B. Fleming and Aaron Colnon, trustees of The Chicago, Rock Island and Pacific Railway Company, hereinafter respectively referred to as the Oklahoma, the Sante Fe, and the Rock Island, and collectively as the carriers, is displaced, that is, placed in a worse position with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules, and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced. The latter compensation is to be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12

months in which he performed services immediately preceding the date of his displacement as a result of this transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). . . . The period during which this protection is to be given, hereinafter called the protective period, shall extend from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein; provided, however, that such protection shall not continue for a longer period following the effective date of our order herein than the period during which such employee was in the employ of the carriers prior to the effective date of our order.

"5. If, as a result of the transaction herein approved, any employee, hereinafter referred to as a dismissed employee, of the carriers is deprived of employment with said carriers because of the abolition of his position or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as result of the transaction herein approved, he shall be accorded a monthly dismissal allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of this transaction. This allowance shall be made during the protective period to each dismissed employee while unemployed, provided, however, that no such allowance shall be paid to any Oklahoma employee who fails to accept employment, with seniority rights in Oklahoma City, Okla., with the Santa Fe or Rock Island, if either of said two last-named carriers offers him a position, the duties of which he is qualified to perform.

"8. In the event that any dispute or controversy arises with respect to the protection afforded by the foregoing conditions Nos. 4, 5, 6, and 7, which cannot be settled by the carriers and the employee, or his authorized representatives, within 30 days after the controversy arises, it may be referred, by either party, to an arbitration committee for consideration and determination, the formation of which committee, its duties, procedures, expenses, et cetera, shall be agreed upon by the carriers and the employee, or his duly authorized representatives."

Plaintiff testified in substance: He was an employee of Atlantic from 20 September 1955 to 4 October 1957, when he was laid off. During that time his general duties were as lead mechanic keeping up the diesel engines. He was making $1.83 an hour. Since he was laid off, he has been offered no employment by Atlantic or Southern. For a period of ten months after he was laid off he made $2,640.20, including unemployment compensation. If he had continued as an employee of

Atlantic, he would have earned during this ten-month period $3,148.40. His position was worsened by being laid off by Atlantic for the ten-month period after he was laid off in the sum of $508.20. He did some work in May 1957 on Navy cars.

H. P. Edwards testified in substance for plaintiff: From 1 September 1939 until 31 August 1957 he served as president, general manager, and chairman of the board of Atlantic — the entire time Atlantic operated the railroad. Plaintiff was employed in Atlantic's maintenance department in New Bern as diesel machinist. The function of the maintenance department was to maintain locomotives, cars, and all classes of equipment. This maintenance is absolutely necessary to the operation of a railroad. Plaintiff's employment as a machinist in the maintenance department of Atlantic would not have terminated, if control of Atlantic had not been acquired by Southern. Atlantic had 14 employees in its mechanical department when Southern acquired control. It retained 5. If Southern had not acquired control of Atlantic, it would not have discontinued its shops at New Bern for maintenance of the railroad. Since Southern acquired control of Atlantic, it sold the machinery in the shops, tore down one building, rented some of them, but does some maintenance there. Mr. Radford succeeded him as general manager of Atlantic in September 1957. Mr. Harry DeButts, president of Southern, succeeded him as president of Atlantic. Edwards testified: "I do not know of any of the maintenance work which was being done at the New Bern shops in the course of the operations of the Atlantic and East Carolina Railway prior to its control having been taken over by the Southern, being done along the road or anywhere else along the road between Goldsboro and Morehead City."

Edwards testified in substance on cross-examination: Atlantic by special contract did general repairs to place U. S. A. X tank cars in good operating condition in its maintenance department in New Bern. He didn't know whether plaintiff worked on these tank cars. For ten years prior to 1957 there had been a steady decline in Atlantic's employees in its maintenance department. Atlantic had no steam locomotive for six months prior to September 1957. Atlantic had a storehouse in New Bern in which a large amount of supplies and stores and parts were kept in September 1957. There were some parts for steam locomotives: he didn't know how much. These parts had very little value. None of the 14 employees in the mechanical department were included in the list of employees in connection with the storehouse. There were employed in the storehouse one storekeeper and a clerk.

Mrs. Marjorie M. Edwards testified in substance for plaintiff: She

GILLIKIN *v.* R.R.

was employed for six years by Atlantic as a clerk in its car accounting office in New Bern. Her employment was terminated on 1 October 1957. She received the following letter:

"ATLANTIC AND EAST CAROLINA RAILWAY CO.
Washington 13, D. C.
December 6, 1957. t/s
H-342-E-57

"Mrs. Marjorie M. Edwards,
1804 National Avenue
New Bern, North Carolina

Dear Mrs. Edwards:

"Referring to your letter of November 9 to Mr. W. C. Radford, General Manager at New Bern, North Carolina saying you were enclosing — 'bill vs. Southern Railway Company and the Atlantic and East Carolina Railway Company for compensation I have lost from October 1st to October 31st, 1957 as result of my job being abolished, resulting from the Southern Railway's purchase of the A & E C Rys. capital stock;' My investigation develops that you were employed as a Clerk in the office of Car Accountant, and that the job you held was covered by the Agreement in effect between this Company and the Brotherhood of Railway and Steamship Clerks. I further find that your job was abolished as result of your work being transferred to and taken over by employees in the office of the Superintendent of Car Service, Southern Railway Company, Atlanta, Ga.

"Under the circumstances, you are entitled to protection contained in the Interstate Commerce Commission's Order which imposed the same conditions for the protection of adversely affected railway employees as were imposed by the Commission in Chicago and Northwestern Railway Company Merger 261 I.C.C. 672, and I am therefore issuing instructions that you be afforded the protection prescribed in the Order. You understand, of course, that any money you have received as unemployment compensation since your job was abolished will be deducted.

Very truly yours,
(s) L. G. TOLLESON
Director of Labor Relations."

She received a second leter from Tolleson dated 30 December 1957, which is in the record, setting forth in detail what information would be required to determine the amount of her monthly dismissal al-

lowance, and stating that after this information had been obtained, there would be prepared and sent to her a draft or voucher in her favor covering the net amount due as dismissal allowance for the months of October, November, and December 1957, which would bring her account up to date, and that for subsequent months in which she was eligible to receive such allowances, such payments, less required deductions, would be made to her on a monthly basis upon receipt from her by Mr. Bergelt of signed statements as to her employment status during the preceding months. She has received, and is still receiving such payments in accordance with the terms of those two letters.

Defendants had one witness, Archie Adams, who testified in substance: He was employed by Atlantic as trainmaster and general foreman at New Bern on 1 October 1957, and has had that employment since then. He had charge of the operation and movement of trains and of the mechanical department. For ten years he had worked for various railroads, and was experienced in the work he was employed by Atlantic to do. When he began work at New Bern on 1 October 1957, his first undertaking was to survey the field, and plan future operations. The storeroom had an over abundance of obsolete parts, such as steam engine parts, though it had no steam engines, a big accumulation of coal, sand, and had equipment all over the grounds that was obsolete and no longer wanted. He found Atlantic was making repairs to Army tank cars, and Navy tank cars, which a railroad independently operating has not the men to do. It was extra work set up in a field to do this type of work. The equipment and tools it would take would not justify the railroad to do the work. He got in touch with the U. S. Army Transportation in St. Louis, and told them since this contract had been signed, we had to assume the obligation to continue if they desired to hold us to it. After a conversation with them, they wanted us to do it any way we could. He told them the shop was not set up efficiently to do it. They then issued permission, if he wanted to, to let it go to the shop in Knoxville, Tennessee. He discontinued the work. On 5 October 1957 plaintiff was laid off. After laying off the men on 5 October 1957, he had for the maintenance of equipment two car men (mechanics), one foreman, and one laborer. The first thing he did was to abandon some of the buildings, and move into one building, so that they wouldn't have men going from several buildings, and the foreman wouldn't have to watch in several buildings. He abandoned the storeroom, the electrical shop, the machine shop and roundhouse, and put all the equipment into one building. He immediately ordered two 75-ton air-jacks. These air-jacks work from compressed air. These air-jacks are used to jack the end of a

car when it is necessary to replace wheels or do any work required, to pull tracks out from under the end of the car. When he arrived there were two 50-ton mechanical jacks, and they have a long lever so that in jacking this it takes two men on the levers, working them, that is two to a jack. You could jack possibly one side a while, and then the other, but that takes considerable time, and has danger in the operation. When he speaks of two jacks, he means one under each side. Air-jacks require two men to operate them, and take 2 or 3 minutes for a lifting operation, whereas mechanical jacks require 4 men to operate them, and take 30 or 40 minutes for a lifting operation.

Atlantic assigns as errors the judge's failure to nonsuit plaintiff's action against it, and the judgment entered permitting plaintiff to recover from it the sum of $508.20. These assignments of error are good. All the evidence shows that Atlantic was not a party to the proceedings in which the Interstate Commerce Commission imposed the employees' protection conditions upon which this action is based. Those proceedings were initiated upon application by Southern, the authority granted by the Commission was granted to Southern, and the employees' protection conditions attached to the authorization of Southern's application to acquire control of Atlantic through capital stock ownership of Atlantic were imposed upon Southern, not upon Atlantic. These conditions imposed upon Southern do not bind Atlantic. *McDow v. Louisiana Southern Railway Company*, 219 F. 2d 650. Plaintiff concedes in his brief that he cannot maintain his action against Atlantic, and that the judgment as to Atlantic should be reversed.

Southern has in the record five assignments of error to the admission of evidence over its objections. These assignments of error are not set out in appellants' brief, and in respect to them no reason or argument is stated or authority cited. They will be taken as abandoned by appellants. Rule 28, Rules of Practice in the Supreme Court, 221 N.C. 544, 562-3; *Construction Co. v. Electrical Workers Union*, 246 N.C. 481, 98 S.E. 2d 852.

Southern's basic contention is that the superior court erred in permitting plaintiff to recover from it in this action based upon the employees' protection conditions imposed by the Commission upon Southern as a condition of its approval and authorization of Southern's application for control of Atlantic through capital stock ownership of Atlantic, because the employees' protection conditions imposed protect employees against loss of employment caused by a unification, consolidation, merger or pooling of previously separate facilities, operations or services of those railroads, and not from other causes, such as the abolishing of a position through modernization or improved facilities by the purchasing railroad. Southern further contends that

Mrs. Marjorie M. Edwards came within the scope and purpose of the employees' protection conditions because her work with Atlantic was consolidated with the work of similar employees of Southern in Atlanta, Georgia, which would not have occurred if Southern had not acquired control of Atlantic. On the other hand, plaintiff's job was abolished because of modernization of equipment and improved procedure, and he does not come within the scope and purpose of the employees' protective conditions imposed upon Southern. In brief, Southern contends the evidence in the instant action as to the cause of plaintiff's loss of employment does not come within the intent and purpose of the Commission's prescribed conditions in the North Western and Oklahoma cases. Southern's argument and contention that plaintiff's evidence and the judge's answers to the issues do not bring him within the scope and purpose of the employees' protective conditions imposed upon Southern are not convincing.

Southern contends that the above contention is based upon its assignments of error as to the overruling of its demurrer to the complaint, as to the court's failure to nonsuit plaintiff's action, as to the court's fixing of Issues 1 and 2 and his answers thereto, as to the court's failure to enter a judgment for the defendants on the third issue, and as to the judgment signed.

Southern's application under the Interstate Commerce Act, 49 U.S.C.A., Section 5(2), was not one "for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership," but was one for Southern, a carrier, "to acquire control of another (Atlantic) through ownership of its (Atlantic's) stock." As a condition of its authorization and approval of Southern's application, the Interstate Commerce Commission was required to act under the Congressional mandate set forth in the Interstate Commerce Act, 49 U.S.C.A., Section 5(2) (f) and to require "a fair and equitable arrangement to protect the interests of" Atlantic's employees affected, and was required to "include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order."

Section 5(2) (f), as it now appears, was enacted as part of the

Transportation Act of 1940. A brief outline of the occurrences which led to the enactment of those sections on railroad consolidation, of which Section 5(2) (f) is a part, is contained in the Appendix to the Court's opinion in *St. Joe Paper Co. v. Atlantic Coast Line R. Co.,* 347 U.S. 298, 315, 98 L. Ed. 710, 724. The legislative history of Section 5(2) (f) is set forth in *Railway Labor Exec. Asso. v. United States,* 339 U.S. 142, 94 L. Ed. 721, in which case the Court says: "The legislative history of Section 5(2) (f) shows that one of its principal purposes was to provide mandatory protection for the interests of employees affected by railroad consolidations."

*Brotherhood of Maintenance of Way Employees v. United States,* 189 F. Supp. 942, was an action to enjoin and set aside an order of the Interstate Commerce Commission approving a railroad merger. The question in issue was whether the conditions attached to the merger for the protection of the employees of the two railroads satisfied the Congressional mandate embodied in Section 5(2) (f) of the Interstate Commerce Act. Plaintiff's contention was that *anything* short of actual continued employment is violative of the language and intendment of Section 5(2) (f) with respect to the phrase therein "being in a worse position with respect to their employment." A statutory three-judge court held: The statute providing that a railroad merger shall not result in railroad employees being in a "worse position with respect to employment" permits the granting of compensatory protection to employees in event of their displacement or discharge, and does not require that each employee be retained in employment status. The temporary restraining order was set aside, and the complaint dismissed.

*Brotherhood of Maintenance of Way Employees v. United States,* *supra,* was affirmed by the United States Supreme Court on 1 May 1961, 366 U.S. 169, 6 L. Ed. 2d 206. The majority opinion gives a somewhat detailed legislative history of the enactment of Section 5(2) (f) and of the statements of Members of Congress when it was being considered, and concludes with this language: "In short, we are unwilling to overturn a long-standing administrative interpretation of a statute, acquiesced in by all interested parties for 20 years, when all the signposts of congressional intent, to the extent they are ascertainable, indicate that the administrative interpretation is correct." Mr. Justice Douglas dissenting said: "I would read the *proviso* as meaning that nothing less than four-year employment protection to every employee would satisfy the Act, though not necessarily a four-year protection in his old job."

As a condition of its authorization and approval of Southern's application to acquire control of Atlantic through capital stock owner-

ship of the latter, the Commission first imposed on Southern for the protection of Atlantic's employees the terms and conditions set forth in the North Western case. Later, on 25 July 1958, the Commission issued an order permitting the Railway Labor Executives' Association to intervene in the proceeding initiated by Southern, and to file a petition for further hearing, reconsideration and supplemental order, for the purpose of introducing evidence concerning the adverse effect of the acquisition of control of Atlantic through capital stock ownership of Atlantic by Southern on the employees of Atlantic, and of requesting the imposition on Southern of the same conditions for the protection of Atlantic's employees as were prescribed in the Oklahoma case. Southern filed a reply to the permitted petition in which it admitted that since acquisition by it of control of Atlantic, employees of Atlantic have been displaced or otherwise adversely affected, in connection with which dispute has arisen between it and the employees involved as to whether they are protected by the prescribed conditions. On 29 September 1958 the Commission, acting under the authority vested in it by 49 U.S.C.A., Section 5 (9), modified its former order and provided "that the approval and authorization of the acquisition by the Southern Railway Company of control of the Atlantic and East Carolina Railway Company through the ownership of capital stock shall be subject to the same conditions for the protection of railway employees as were imposed in *Oklahoma Ry. Co. Trustees Abandonment,* 257 I.C.C. 177."

The terms and conditions imposed upon Southern in the North Western Case are a paraphrase of the mandatory provisions to protect employees set forth in Section 5 (2) (f), and provided as a condition of its approval and authorization of Southern's application to acquire control of Atlantic through capital stock ownership that such acquisition shall not result in employees of Atlantic "being in a worse position with respect to their employment" during a certain period there specified. The language of the statute and the words of the prescribed conditions in the North Western case are broad and extensive, and do not mean that the statute and the prescribed conditions protect Atlantic's employees only against "being in a worse position" as a result of a unification, consolidation, merger or pooling of previously separate facilities, operations or services of Atlantic and Southern, but do mean that they protect Atlantic's employees from being put in a worse position with respect to their employment as a result of Southern's acquisition of control of Atlantic for a certain specified period of time. The prescribed conditions in the Oklahoma case for the protection of Atlantic's employees give substantially similar protection to Atlantic's employees, which conditions are set forth in more detail than

in the North Western case, and also provide for an arbitration procedure.

This evidence is uncontradicted: Southern took over control of Atlantic on 1 October 1957. Plaintiff, who was an employee of Atlantic from 20 September 1955 to 4 October 1957 as lead mechanic keeping up Atlantic's diesel engines, was laid off by Atlantic on 4 October 1957. Since he was laid off, he has been offered no employment by Atlantic or Southern. For a period of ten months after he was laid off he made $2,640.20, including unemployment compensation. If he had continued as an employee of Atlantic, he would have earned during this ten-month period $3,148.40. His position was worsened by being laid off by Atlantic for this ten-month period in the sum of $508.20. Plaintiff's employment as a machinist in the maintenance department of Atlantic would not have been terminated, if control of Atlantic had not been acquired by Southern. If Southern had not acquired control of Atlantic, Atlantic would not have discontinued its shops at New Bern for maintenance of the railroad. It is manifest that Southern's acquisition of control of Atlantic resulted in plaintiff being deprived of his employment with Atlantic four days after Southern took control of Atlantic, and "being in a worse position with respect to his employment," and that this was a violation by Southern of the conditions imposed upon it by the Commission for the protection of Atlantic's employees, and this is true even though plaintiff's job was abolished because of modernization of equipment or improved facilities by Southern, the purchasing railroad. This uncontradicted evidence fully supports the judge's findings of fact and answers to the first two issues and the fifth issue. It seems that the trial judge was of opinion that the transaction here was an acquisition of control of Atlantic by Southern through capital stock ownership of the former, and not a unification, consolidation, merger, or pooling of Atlantic's and Southern's previously separate facilities, operations, or services, and that is the reason why he answered the third issue No. However that may be, in our opinion, the judge's consideration of and answer to the third issue was supererogatory, because his findings of fact and and answers to the first, second and fifth issues are decisive of plaintiff's right to recover from Southern under the mandatory provisions of Section 5(2) (f), support the judgment that plaintiff recover $508.20 from Southern, and this is true, even though the judge answered the third issue No. Defendants make no contention that if plaintiff is entitled to recover, $508.20 is not the proper amount of recovery.

Defendants in their brief have not challenged the jurisdiction of the State court. The State court seems to have jurisdiction here. 11

Am. Jur., Commerce, Section 156, Jurisdiction of State courts; Annotation, 64 A.L.R. 333.

Neither have defendants contended that the arbitration procedure set forth in the Oklahoma case is compulsory. It seems to be optional. There is nothing in the record to indicate the formation of an arbitration committee as provided for in the Oklahoma case.

All of Southern's assignments of error are overruled.

The judgment that plaintiff shall recover $508.20 from Atlantic is reversed, and a judgment will be entered below nonsuiting plaintiff's action against Atlantic. The judgment that plaintiff shall recover $508.20 from Southern is affirmed, but the judgment will be modified to the extent that plaintiff's recovery shall be from Southern alone.

Judgment as to Atlantic and East Carolina Railroad — Reversed.

Judgment as to Southern Railroad — Affirmed.