**C. B. TAYLOR, Plaintiff,**

v.

**SOUTHERN RAILWAY COMPANY, Defendant.**

**Civ. No. 546.**

United States District Court
E. D. North Carolina,
New Bern Division.

May 13, 1966.

---

Jones, Reed & Griffin, Kinston, N. C., for plaintiff.

Thomas J. White, Kinston, N. C., and William T. Joyner, Raleigh, N. C., for defendant.

OPINION and ORDER

LARKINS, District Judge:

SUMMARY

This cause comes before the Court as a civil action founded in contract. The contract was allegedly based on certain employee protective provisions embodied in various orders issued by the Interstate Commerce Commission.

The action was begun in the Superior Court of Lenoir County, North Carolina, by the plaintiff, who is a former employee of Atlantic and East Carolina Railroad Company (hereinafter referred to as Atlantic). Plaintiff brought the suit against Atlantic, a corporation chartered under the laws of the State of North Carolina, and against the Southern Railway Company (hereinafter referred to as Southern), a Virginia corporation. The action was thereafter removed to this Court after plaintiff took a voluntary judgment of nonsuit against Atlantic, the North Carolina defendant.

Jurisdiction is, therefore, based on diversity of citizenship and requisite statutory amount in controversy.

The Court proceeded to hear the testimony of the parties and witnesses without the intervention of a jury at the November 29, 1965 Term of this Court at New Bern, North Carolina. Interrog-

atories, exhibits and depositions were also entered in the record for consideration by the Court. Counsel then offered memorandum of facts and law, which have been considered by the Court. The nature of the case is as follows, as is developed from all that entered into the record, and as appears from the arguments of counsel.

Plaintiff insists that Southern and Atlantic contracted together to protect the employment interests of plaintiff at the time defendant was authorized by the Interstate Commerce Commission to acquire the controlling stock interests of Atlantic. This employment protective provision agreement was made a part of the Interstate Commerce Commission proceedings and orders.

Plaintiff states that he was dismissed by Southern on October 4, 1957, in a manner contrary to the terms of the employee protective agreement which are part of the Interstate Commerce Commission Order allowing Southern's acquisition of Atlantic. The plaintiff prays for a monetary judgment as compensation for lost salary, together with interest, damages for lost property as a result of his decreased income, attorneys' fees and costs of the action.

Defendant answered admitting plaintiff's position with Atlantic was abolished in form after Atlantic was acquired by Southern. Southern denies, however, that plaintiff was adversely affected as a result of the acquisition. Defendant states plaintiff is not entitled to relief under the employees' protective provisions and prays the action be dismissed.

## FINDINGS OF FACT

Atlantic operates carrier properties under a lease from the Atlantic and North Carolina Railroad Company, the lease expiring in 1994. The Atlantic interests extend from Goldsboro, North Carolina, to Morehead City, North Carolina, an Atlantic Ocean port. This is an operation extending over a distance of some ninety-six miles.

On October 22, 1954, Southern filed a petition with the Interstate Commerce Commission wherein it sought to acquire control of Atlantic and its leasehold interests. This seeking of control of Atlantic was to be accomplished through the acquisition of Atlantic's capital stock. Approval of the acquisition was sought by the parties pursuant to the provisions of Section 5(2) of the Interstate Commerce Act, Title 49 U.S.C.A. Sec. 5(2).

Section 5(2) of the Act provides in pertinent parts:

"Unifications, mergers, and acquisitions of control.

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or * * * to acquire control of another through ownership of its stock or otherwise . . . or

\* \* \* \* \* \*

"(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, * * *."

This acquisition through purchase of stock was ultimately approved by the Interstate Commerce Commission on September 19, 1957. Certain prescribed conditions for the protection of the interests of Atlantic employees who might be adversely affected as a result of the acquisition were imposed upon Southern, as required by the above-stated statute. The effective date of the Commission's order allowing the acquisition was February 27, 1957.

Subsequently, by a Supplemental Order dated September 29, 1958, the Commission replaced the employee protective provisions it had originally imposed, and which were known as the "Northwestern Conditions" (from Chicago N. W. Ry. Co. Merger, 261 I.C.C. 672 (1946)), with conditions the Commission had imposed in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (1944), and known as the "Oklahoma conditions."

"4. If, as a result of the abandonment of operation herein permitted and the purchases et cetera, herein authorized, hereinafter referred to as the transaction, any employee * * * is displaced, that is, placed in a worse position with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules, and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced. The latter compensation is to be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12 months in which he performed services immedi-

ately preceding the date of his displacement as a result of this transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). If his compensation in his retained position in any month is less than the aforesaid average compensation in the test period, he shall be paid the difference, less compensation at the rate of the position from which he was displaced for time lost on account of his voluntary absences in his retained or current position, but if in his retained position he works in any month in excess of the average monthly time paid for in the test period, he shall be compensated for the excess time at the rate of pay of the retained position; provided, however, that nothing herein shall operate to affect in any respect the retirement on pension or annuity rights and privileges in respect of any employee; provided, further, that if any employee elects not to exercise his seniority rights he shall be entitled to no allowance, * * *. The period during which this protection is to be given, hereinafter called the protective period, shall extend from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein; * * *.

"5. If, as a result of the transaction herein approved, any employee, hereinafter referred to as a dismissed employee, of the carriers is deprived of employment with said carriers because of the abolition of his position or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as result of the transaction herein approved, he shall be accorded a monthly dismissal allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of this trans-

action. This allowance shall be made during the protective period to each dismissed employee while unemployed, * * *.

"The dismissal allowance of any dismissed employee who is otherwise employed shall be reduced to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his representative, and the carriers, should agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

"The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for which he is eligible, or in the event of his resignation, death, retirement on pension or dismissal for good cause."

Plaintiff, C. B. Taylor, first began working for Atlantic in July, 1944. He was continuously employed by Atlantic, thereafter, until October 4, 1957. His last position with Atlantic was that of car inspector, which position he had held for approximately ten (10) years.

After Southern acquired Atlantic, the method of going about car inspecting was changed. Prior to Southern's change of procedure, plaintiff worked in Atlantic's yard in New Bern, where he inspected the railroad cars as they came into the yard. He would look for defects in the railroad cars; and when they were found, he would fix those he was able to repair and he "tagged" the remaining cars which were found to have defects. These "tagged" cars were then "cut out" from the train and sent into the shops for the required repairs.

Southern's changes included outfitting a one and one-half ton pick-up truck, which belonged to Atlantic, with portable repair equipment and tools. The truck was sent out to the various locations of railroad cars which were in need of repairs. Repairs would then be made along the line, in the field, so to speak, rather than in the yard at New Bern. The car inspector's position in New Bern yard was, therefore, abolished. A requirement of the new position was that the person conducting these repairs in the field have a driver's license. Plaintiff did not have the required license, being unable to drive.

Another position open to plaintiff and offered to him by Southern required him to operate a 75- to 100- ton derrick which was mounted on a flatcar. He was not able to qualify for this position either. Plaintiff was offered either position; that of the operator of the mobile repair truck or that of derrick operator. Being unable to qualify for either, having been the car inspector in the railroad yard at New Bern for the previous ten (10) years, plaintiff found he was no longer employed.

It can be seen that the duties of inspecting and maintaining railroad cars continued after the Southern acquisition, but a new requirement for the position was added by Southern to the former position of car inspector. That is, the position now demanded that plaintiff or his replacement be able to operate a motor vehicle along the highways of North Carolina or operate a derrick. The nature of the position had materially changed.

## CONCLUSIONS OF LAW

Plaintiff was an employee within the protective provisions of Section 5(2) (f) of the Act, and according to the Orders of the Commission. This is conceded by defendant. Further, his employment was terminated, and he was put in a worse position within the meaning of the "Oklahoma conditions," which are controlling in this case, after the acquisition by Southern.

It is defendant's contention, however, that he was not deprived of employment by abolition of his position, or by the exercise of seniority rights of another employee whose position was abolished, as specified in the "Oklahoma conditions." Rather, it is defendant's position that plaintiff's duties *were changed* to include a new requirement which plaintiff could not fulfill. It is for this reason, defendant insists, that plaintiff lost his employment and is not entitled to relief. Defendant's position is untenable and without merit.

Section 5 of the "Oklahoma conditions" refers to a "dismissed employee" as one "whose position is abolished as result of the transaction * * *." It is a play on words to suggest an employment position was merely changed but not abolished when, as a result of the changes, the position bears little resemblance to that position from which the changes took place at the time plaintiff was performing his duties. This case is clearly one in that class of cases discussed in Gillikin v. Atlantic & East Carolina Ry. Co. and Southern Ry. Co., 255 N.C. 228, 120 S.E.2d 847 (1961).

In *Gillikin,* supra, Parker J. (now Chief Justice), in speaking for the court, concluded that if Southern had not acquired Atlantic the changes which took place would not have otherwise occurred. It further appeared that the changes were those which caused plaintiff to be adversely affected within the meaning of the controlling "Oklahoma conditions." In other words, despite defendant's insistence that these changes or modernizations were done for economy reasons, thereby affecting plaintiff's economic position, the fact remains plaintiff found himself unemployed as a result of Southern's acquisition. The only way these modernizations and changes can be explained as occurring is by recognizing the fact that they are a result of Southern's acquisition of Atlantic. Thus, when a plaintiff finds himself in an adverse position as a result of changes which would not have resulted but for Southern's acquisition, it would seem that the acquiring party should be liable. Gillikin v. Atlantic East Carolina Ry. Co. and Southern Ry. Co., supra; and Brotherhood Maintenance of Way Employees v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961).

### ORDER

Therefore, it is ordered that plaintiff's prayer for monetary relief be, and the same is, hereby allowed.

It is further ordered that the Clerk serve a copy of this opinion and order upon all counsel of record.