**W. J. EDWARDS, Plaintiff,**

v.

**SOUTHERN RAILWAY COMPANY,**
**Defendant.**

**Civ. No. 549.**

United States District Court
E. D. North Carolina,
New Bern Division.

May 19, 1966.

Jones, Reed & Griffin, Kinston, N. C., for plaintiff.

Thomas J. White, Kinston, N. C., and William T. Joyner, Raleigh, N. C., for defendant.

## OPINION and ORDER

LARKINS, District Judge:

### SUMMARY

This cause comes before the Court as a civil action founded in contract. The contract was allegedly based on certain employee protective provisions embodied in various orders issued by the Interstate Commerce Commission.

The action was begun in the Superior Court of Lenoir County, North Carolina, by the plaintiff, who is a former employee of Atlantic and East Carolina Railroad Company (hereinafter referred to as Atlantic). Plaintiff brought the suit against Atlantic, a corporation chartered under the laws of the State of North Carolina, and against the Southern Railway Company (hereinafter referred to as Southern), a Virginia corporation. The action was thereafter removed to this Court after plaintiff took a voluntary judgment of nonsuit against Atlantic, the North Carolina defendant.

Jurisdiction is, therefore, based on diversity of citizenship and requisite statutory amount in controversy.

The Court proceeded to hear the testimony of the parties and witnesses without the intervention of a jury at the November 29, 1965 Term of this Court at New Bern, North Carolina. Interrogatories, exhibits and depositions were also entered in the record for consideration by the Court. Counsel then offered memorandum of facts and law, which have been considered by the Court. The nature of the case is as follows, as is developed from all that entered into the record, and as appears from the arguments of counsel.

Plaintiff insists that Southern and Atlantic contracted together to protect the employment interests of plaintiff at the time defendant was authorized by the Interstate Commerce Commission to acquire the controlling stock interests of Atlantic. This employment protective provision agreement was made a part of the Interstate Commerce Commission proceedings and orders.

Plaintiff avers that Southern dismissed him from his position of employment in a manner contrary to the terms of the protective agreement. Plaintiff prays for a recovery of monetary damages, together with the costs of this action and reasonable attorneys' fees.

Defendant has answered denying plaintiff was subject to the benefits of the employees' protective agreement because he was not an employee of Atlantic. Defendant insists plaintiff was an officer of Atlantic and not an employee within the meaning of the term "employee" as used by the Interstate Commerce Commission in its order and amended order allowing the acquisition of Atlantic by Southern.

Defendant further insists that even if plaintiff was subject to the employee protective provisions of the Order of the Commission, he would not be entitled to relief. This is so, defendant insists, because plaintiff was not dismissed according to the provisions as set forth in the "Oklahoma conditions." Defendant argues that the two positions plaintiff held were not abolished, nor was plaintiff displaced by an employee senior to him. It is defendant's contention that he was "replaced" as the Freight Agent in New Bern, and his other position as Chief Mechanical Engineer was consolidated with the position of Train Master, thereby leaving plaintiff with no position.

## FINDINGS OF FACT

Atlantic operates carrier properties under a lease from the Atlantic and North Carolina Railroad Company, the lease expiring in 1994. The Atlantic interests extend from Goldsboro, North Carolina, to Morehead City, North Carolina, an Atlantic Ocean port. This is an operation extending over a distance of some ninety-six miles.

On October 22, 1954, Southern filed a petition with the Interstate Commerce Commission wherein it sought to acquire control of Atlantic and its leasehold interests. This seeking of control of Atlantic was to be accomplished through the acquisition of Atlantic's capital stock. Approval of the acquisition was sought by the parties pursuant to the provisions of Section 5(2) of the Interstate Commerce Act, Title 49 U.S.C.A. Sec. 5(2).

Section 5(2) of the Act provides in pertinent parts:

*"Unifications, mergers, and acquisitions of Control.*

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or * * * to acquire control of another through ownership of its stock or otherwise; . . . or

\* \* \* \* \* \*

"(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, * * *."

This acquisition through purchase of stock was ultimately approved by the Interstate Commerce Commission on September 19, 1957. Certain prescribed conditions for the protection of the interests of Atlantic employees who might be adversely affected as a result of the acquisition were imposed upon Southern, as required by the above-stated statute. The effective date of the Commission's Order allowing the acquisition was February 27, 1957.

Subsequently, by a Supplemental Order dated September 29, 1958, the Commission replaced the employee protective provisions it had originally imposed, and which were known as the "Northwestern Conditions" (from Chicago N.W.Ry. Co. Merger, 261 I.C.C. 672 (1946)), with conditions the Commission had imposed in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (1944), and known as the "Oklahoma conditions."

"4. If, as a result of the abandonment of operation herein permitted and the purchases et cetera, herein authorized, hereinafter referred to as the transaction, any employee * * * is displaced, that is, placed in a worse position with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules, and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced. The latter compensation is to be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12 months in which he performed services immediately preceding the date of his displacement as a result of this transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). If his compensation in his retained position in any month is less than the aforesaid average compensation in the test period, he shall be paid the difference, less compensation at the rate of the position from which he was displaced for time lost on account of his voluntary absences in his retained or current position, but if in his retained position he works in any month in excess of the average monthly time paid for in the test period, he shall be compensated for the excess time at the rate of pay of the retained position; provided, however,

that nothing herein shall operate to affect in any respect the retirement on pension or annuity rights and privileges in respect of any employee; provided, further, that if any employee elects not to exercise his seniority rights he shall be entitled to no allowance, * * *. The period during which this protection is to be given, hereinafter called the protective period, shall extend from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein; * * *.

"5. If, as a result of the transaction herein approved, any employee, hereinafter referred to as a dismissed employee, of the carriers is deprived of employment with said carriers because of the abolition of his position or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as result of the transaction herein approved, he shall be accorded a monthly dismissal allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of this transaction. This allowance shall be made during the protective period to each dismissed employee while unemployed, * * *.

"The dismissal allowance of any dismissed employee who is otherwise employed shall be reduced to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his representative, and the carriers, should agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

"The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for which he is eligible, or in the event of his resignation, death, retirement on pension, or dismissal for good cause."

Plaintiff, W. J. Edwards, is the son of H. P. Edwards. H. P. Edwards headed Atlantic as its President or as the Chairman of the Board and General Manager from 1939 until it was taken over by Southern in 1957. W. J. Edwards was first employed by his father in 1946, as a diesel mechanic.

From that position as diesel mechanic, to which he was first assigned, until February 1954, plaintiff held various positions with Atlantic. In February 1954, he was made Atlantic's Freight Agent in New Bern, with supervision over approximately seven persons. He continued in that position until November 30, 1957, when he left the employ of Southern involuntarily.

In addition to his position as Freight Agent, plaintiff was also employed by Atlantic as Chief Mechanical Engineer. He held this position from February 1954 until his involuntary discharge on November 30, 1957. He received a separate salary of $75.00 per month for the services performed in this capacity. His duties as Chief Mechanical Engineer consisted of acting as a technical consultant to this father, the General Manager.

It is conceded by defendant that the position of Chief Mechanical Engineer was, although not abolished, taken away from the plaintiff by the process of consolidating it with that of other employees under the titles of Train Master and General Foreman. Other employees were then given the duties of the position, thereby making it unavailable to plaintiff any longer.

The position of Freight Agent in New Bern was not abolished, but plaintiff was removed from it on November 30, 1957. There is no evidence in the record to effectively explain plaintiff's removal from this position, nor is it contended that he was removed due to his improper or insubordinate conduct. The only attempted explanation for plaintiff's removal is that plaintiff was contemplating going to work for his father, if his father, in turn, successfully obtained control of another nearby railroad.

Plaintiff was not a member of the Board of Directors of Atlantic during the period he held the position of Chief Mechanical Engineer, nor was he elected to that position by the stockholders. He held no authority by virtue of that position, but served in a consulting or advisory capacity only to his father. He was not an official of Atlantic.

### CONCLUSIONS OF LAW

■ The provisions of the "Oklahoma conditions," which were imposed by the Interstate Commerce Commission in its authorization for Southern to acquire control of Atlantic, govern the rights of the parties. In order for the plaintiff to recover, therefore, he must show that he is an employee within the meaning of that term "employee" as it is used in the "Oklahoma conditions." He must also show that he was, as a result of the acquisition of Atlantic by Southern, put in a worse position with respect to his employment.

■ In determining when one is an employee or an official, under the Railway Labor Act, one must look to the facts of each case. The Commission aptly stated In The Matter of Regulations Concerning The Class of Employees And Subordinate Officials To Be Included Within The Term "Employee" Under The Railway Labor Act, 266 I.C.C. 85, @ 92 (1946), the following:

"However, in the final analysis rank and title are not controlling in defining the work of subordinate officials, and we are unable to conclude that there is any fixed outstanding factor which will always control, without exception. We do not believe that as a practical matter it is feasible to make a definite line of demarcation between the work of subordinate officials and that of officials. * * * Each proceeding, therefore, must of necessity be decided upon the record * * *."

And so this is what has been done in this case.

The above-quoted decision was rendered in affirming prior Commission decisions which held such titles as roadmaster (in 263 I.C.C. 607), general roadmaster, general foreman, supervisor of bridges and buildings, and supervisors and inspectors of signals, and their various assistants (in 264 I.C.C. 239) were all "employees" for purposes of receiving protection under the Railway Labor Act.

■ It is clear from these decisions, therefore, that the plaintiff, while serving in the capacity of Chief Mechanical Engineer, was not an official of Atlantic. He was an employee entitled to the benefits of the "Oklahoma conditions," at least as far as the extent of compensation received for his services in that position are concerned.

■ Defendant also insists that plaintiff is not one of that class of employees protected by Section 5(2) (f) of the Act, and the "Oklahoma conditions," as far as his being "replaced" in the position of Freight Agent at New Bern, because he was not "displaced," but "replaced." It is difficult to understand defendant's distinction. Surely this Court is not expected to be controlled by hypertechnical and strained distinctions in definitions.

The Court is not limited to restrictive and strained readings of the Order of the Commission. Rather, it will go to the statute which is designed to protect the employment interests of those employees adversely affected by an acquisition. Section 5(2) (f) states in part, as follows:

"As a condition of its approval, * * * the Commission shall require

a fair and equitable arrangement to protect the interests of the railroad employees affected."

Reading the "Oklahoma conditions," in terms of the above-quoted section of the Act, makes it clear that the Order of the Commission was not limited to protecting those employees "displaced" by means of the abolition of their position, or being "displaced" by a senior employee. "Displaced" is defined in the "Oklahoma conditions," paragraph four, as follows:

" * * * displaced, that is, *placed in a worse position with respect to his compensation and rules governing his work conditions,* and so long thereafter as he is unable * * * to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced * * *." (Emphasis added.)

Surely defendant does not contend plaintiff has not been placed "in a worse position with respect to his compensation * * *." The meaning is clear, by "replacing" plaintiff, he was in fact "displaced" and is entitled to the benefits of the Order of the Commission, issued under the provisions of Section 5 (2) (f) of the Act.

It is also clear that but for the acquisition of Atlantic by Southern, plaintiff would have continuously held both of his positions from which he was involuntarily removed by Southern. In that respect, the conclusions reached by the Supreme Court of the State of North Carolina in Gillikin v. Atlantic & E. C. Ry. Co., 255 N.C. 228, 120 S.E.2d 847 (1961) are controlling.

### ORDER

Therefore, it is ordered that plaintiff's prayer for monetary relief be, and the same is hereby allowed.

It is further ordered that the Clerk serve a copy of this Opinion and Order upon all counsel of record.