**Winslow M. EDWARDS, Plaintiff,**

v.

**SOUTHERN RAILWAY COMPANY,
Defendant.**

**Civ. No. 544.**

United States District Court
E. D. North Carolina,
New Bern Division.

May 9, 1966.

Jones, Reed & Griffin, Kinston, N. C., for plaintiff.

Thomas J. White, Kinston, N. C., and William T. Joyner, Raleigh, N. C., for defendant.

## OPINION and ORDER

LARKINS, District Judge:

### SUMMARY

This cause comes before the Court as a civil action founded in contract. The contract was allegedly based on certain employee protective provisions embodied in various orders issued by the Interstate Commerce Commission.

The action was begun in the Superior Court of Lenoir County, North Carolina, by the plaintiff, who is a former employee of Atlantic and East Carolina Railroad Company (hereinafter referred to as Atlantic). Plaintiff brought the suit against Atlantic, a corporation chartered under the laws of the State of North Carolina, and against the Southern Railway Company (hereinafter referred to as Southern), a Virginia corporation. The action was thereafter removed to this Court after plaintiff took a voluntary judgment of nonsuit against Atlantic, the North Carolina defendant.

Jurisdiction is, therefore, based on diversity of citizenship and requisite statutory amount in controversy.

The Court proceeded to hear the testimony of the parties and witnesses without the intervention of a jury at the November 29, 1965 Term of this Court at New Bern, North Carolina. Interrogatories, exhibits and depositions were also entered in the record for consideration by the Court. Counsel then offered memorandum of facts and law, which have been considered by the Court. The nature of the case is as follows, as is developed from all that entered into the record, and as appears from the arguments of counsel.

Plaintiff insists that Southern and Atlantic contracted together to protect the employment interests of plaintiff at the time defendant was authorized by the Interstate Commerce Commission to acquire the controlling stock interests of Atlantic. This employment protective provision agreement was made a part of the Interstate Commerce Commission proceedings and orders.

Plaintiff avers that Southern dismissed him from his position of employment in a manner contrary to the terms of the protective agreement. Plaintiff prays for a recovery of monetary damages, together with the costs of this action and reasonable attorneys' fees.

Defendant has answered denying plaintiff was subject to the benefits of the employees' protective agreement because he was not an employee of Atlantic. Defendant insists plaintiff was an officer of Atlantic and not an employee within the meaning of the term "employee" as used by the Interstate Commerce Commission in its order and amended order allowing the acquisition of Atlantic by Southern.

### FINDINGS OF FACT

Atlantic operates carrier properties under a lease from the Atlantic and North Carolina Railroad Company, the lease expiring in 1994. The Atlantic interests extend from Goldsboro, North Carolina, to Morehead City, North Carolina, an Atlantic Ocean port. This is an operation extending over a distance of some ninety-six miles.

On October 22, 1954, Southern filed a petition with the Interstate Commerce Commission wherein it sought to acquire control of Atlantic and its leasehold interests. This seeking of control of Atlantic was to be accomplished through the acquisition of Atlantic's capital stock. Approval of the acquisition was sought by the parties pursuant to the provisions of Section 5(2) of the Interstate Commerce Act, Title 49 U.S.C.A. Sec. 5(2).

Section 5(2) of the Act provides in pertinent parts:

"*Unifications, mergers, and acquisitions of control.*

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof,

into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, "of another; or * * * to acquire control of another carrier through ownership of its stock or otherwise; or

' *  *  *  *  *  *

"(f) as a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment * * *."

This acquisition through purchase of stock was ultimately approved by the Interstate Commerce Commission on September 19, 1957. Certain prescribed conditions for the protection of the interests of Atlantic employees who might be adversely affected as a result of the acquisition were imposed upon Southern, as required by the above-stated statute. The effective date of the Commission's Order allowing the acquisition was February 27, 1957.

Subsequently, by a Supplemental Order, dated September 29, 1958, the Commission replaced the employee protective provisions it had originally imposed, and which were known as the "Northwestern Conditions" (from Chicago N. W. Ry. Co. Merger, 261 I.C.C. 672 (1946)), with conditions the Commission had imposed in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (1944), and known as the "Oklahoma Conditions."

"4. If, as a result of the abandonment of operation herein permitted and the purchases et cetera, herein authorized, hereinafter referred to as the transaction, any employee * * * is displaced, that is, placed in a worse position with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules, and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced. The latter compensation is to be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12 months in which he performed services immediately preceding the date of his displacement as a result of this transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). If his compensation in his retained position in any month is less than the aforesaid average compensation in the test period, he shall be paid the difference, less compensation at the rate of the position from which he was displaced for time lost on account of his voluntary absences in his retained or current position, but if in his retained position he works in any month in excess of the average monthly time paid for in the test period, he shall be compensated for the excess time at the rate of pay of the retained position; provided, however, that nothing herein shall operate to affect in any respect the retirement on pension or annuity rights and privileges in respect of any employee; provided, further, that if any employee elects not to exercise his seniority rights he shall be entitled to no allowance, * * *

The period during which this protection is to be given, hereinafter called the protective period, shall extend from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein; * * *.

"5. If, as a result of the transaction herein approved, any employee, hereinafter referred to as a dismissed employee, of the carriers is deprived of employment with said carriers because of the abolition of his position or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as result of the transaction herein approved, he shall be accorded a monthly dismissal allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of this transaction. This allowance shall be made during the protective period to each dismissed employee while unemployed, * * *.

"The dismissal allowance of any dismissed employee who is otherwise employed shall be reduced to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his representative, and the carriers, should agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

"The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for which he is eligible, or in the event of his resignation, death, retirement on pension, or dismissal for good cause."

Plaintiff, Winslow M. Edwards, is a son of H. P. Edwards, who has headed Atlantic as its President or Chairman of the Board and General Manager from 1939 until it was taken over by Southern in 1957. Winslow M. Edwards was first employed by Atlantic upon being hired by his father, in September 1939. He was then employed in the storing and supply department. (Tr. p. 79). He next went to the position of Assistant to the Road Master. He held that position until May of 1944, at which time he left Atlantic for a position with a railroad in Georgia. (Tr. p. 80).

Plaintiff returned to Atlantic in September 1950, and was, upon his return, appointed to the position of Freight Agent in New Bern, North Carolina. After remaining in that position for approximately one year, he was elevated to the position of "Chief Engineer" on November 28, 1951. General Manager and Chairman of the Board, H. P. Edwards, directed all employees of Atlantic, in Bulletin No. 470,

"All engineering matters must be cleared through his office, such as construction of new side tracts, new buildings and structures of all kinds. The adoption of standards in the construction of trestles, bridges, buildings, tract material, etc." (Defendant's Exhibit #1).

Plaintiff remained in this position until 1957, when Southern took over control of Atlantic. H. P. Edwards states he put the plaintiff in the position because his son was qualified to relieve him of some of the details of management. Mr. Edwards needed this relief due to his recent onset of poor health. (Depo. of H. P. Edwards, p. 18).

Plaintiff was employed by his father, and was under his direct control. The position was listed as a person holding office in the Annual Report of Atlantic to the Utilities Commission of North Carolina. (Defendant's Exhibit #5). Mr. H. P. Edwards made it clear, how-

ever, that this was not an elective office by the stockholders, and he was not considered an officer of Atlantic. (Depo., p. 8).

Mr. H. P. Edwards gave plaintiff his position for the reason that Mr. Edwards' health was failing and the details of the Maintenance and Way Department were becoming too much for him to handle. Mr. Edwards gave his son, "authority over the Maintenance and Way Department under my direction." (Depo., p. 8). In fact, Mr. Edwards was the Engineer over the Maintenance and Way Department while plaintiff merely served as his salaried assistant.

## CONCLUSIONS OF LAW

The provisions of the "Oklahoma Conditions", which were imposed by the Interstate Commerce Commission in its authorization for Southern to acquire control of Atlantic, governs the rights of the parties. In order for the plaintiff to recover, therefore, he must show that he is an employee within the meaning of that term "employee" as it is used in the "Oklahoma Conditions." He must also show that he was, as a result of the acquisition of Atlantic by Southern, put in a worse position with respect to his employment.

It is clear from the evidence that plaintiff was not an official of Atlantic, and that he did suffer detriment to his employment position. He was no longer in the employ of Atlantic, and financial injury resulted. As a practical matter, it is clear that plaintiff had no higher status than that of any employee with some limited supervisory authority. His decision-making authority was severely limited to those decisions involving mere details which any foreman or supervisor in the field might be permitted to make. Plaintiff simply carried out the directions of his father, the General Manager. When his father left Atlantic, plaintiff's position was eliminated.

In determining when one is an employee or an official, under the Railway Labor Act, one must look to the facts of each case. The Commission aptly stated *In The Matter of Regulations Concerning The Class of Employees and Subordinate Officials To Be Included Within The Term "Employee" Under The Railway Labor Act*, 266 I.C.C. 85, @92 (1946), the following:

"However, in the final analysis rank and title are not controlling in defining the work of subordinate officials, and we are unable to conclude that there is any fixed outstanding factor which will always control, without exception. We do not believe that as a practical matter it is feasible to make a definite line of demarcation between the work of subordinate officials and that of officials. \* \* \* Each proceeding, therefore, must of necessity be decided upon the record \* \* \*."

And so this is what has been done in this case.

The above-quoted decision was rendered in affirming prior Commission decisions which held such titles as roadmaster (in 263 I.C.C. 607), general roadmaster, general foreman, supervisor of bridges and buildings, and supervisors and inspectors of signals, and their various assistants (in 264 I.C.C. 239), were all "employees" for purposes of receiving protection under the Railway Labor Act.

Plaintiff was, at most, serving in the capacity of an assistant to the Chief Engineer of the Maintenance and Way Department. As such, he was not an officer and had none of the characteristics of an officer.

## ORDER

Therefore, it is ordered that plaintiff's prayer for monetary relief be, and the same is hereby allowed.