Charlie **SHEPPARD**, Plaintiff,

v.

**SOUTHERN RAILWAY COMPANY,**
**Defendant.**

**Civ. No. 550.**

United States District Court
E. D. North Carolina,
New Bern Division.

May 20, 1966.

Jones, Reed & Griffin, Kinston, N. C., for plaintiff.

Thomas J. White, Kinston, N. C., and William T. Joyner, Raleigh, N. C., for defendant.

## OPINION and ORDER

LARKINS, District Judge:

### SUMMARY

This cause comes before the Court as a civil action founded in contract. The contract was allegedly based on certain employee protective provisions embodied in various orders issued by the Interstate Commerce Commission.

The action was begun in the Superior Court of Lenior County, North Carolina, by plaintiff, who is a former employee of Atlantic and East Carolina Railroad Company (hereinafter referred to as Atlantic). Plaintiff brought the suit against Atlantic, a corporation chartered under the laws of the State of North Carolina, and against the Southern Railway Company (hereinafter referred to as Southern), a Virginia corporation. The action was thereafter removed to this Court after plaintiff took a voluntary judgment of nonsuit against Atlantic, the North Carolina defendant.

Jurisdiction is, therefore, based on diversity of citizenship and requisite statutory amount in controversy.

The Court proceeded to hear the testimony of the parties and witnesses without the intervention of a jury at the November 29, 1965 Term of this Court at New Bern, North Carolina. Interrogatories, exhibits and depositions were also entered in the record for consideration by the Court. Counsel then offered memorandum of facts and law, which have been considered by the Court. The nature of the case is as follows, as is developed from all that entered into the record, and as appears from the arguments of counsel.

Plaintiff insists that Southern and Atlantic contracted together to protect the employment interests of plaintiff at the time defendant was authorized by the Interstate Commerce Commission to acquire the controlling stock interests of Atlantic. This employment protective provision agreement was made a part of the Interstate Commerce Commission proceedings and orders.

Plaintiff insists that his position as a helper in the Atlantic shops at New Bern was abolished as a result of Southern's acquisition. He states that his job was abolished on October 4, 1957, and that he was offered no further employment by Atlantic or Southern. Shortly thereafter, however, plaintiff was employed by Atlantic in a position he sought on his own initiative. He was retained in this latter position for a period of less than one week.

Defendant's answer insists plaintiff was dismissed from his position as a helper in the yards at New Bern as the result of internal improvements and economies, thereby making his former position of helper no longer necessary. For this reason, defendant argues, plaintiff is not entitled to the benefits provided for under the "Oklahoma conditions" because the "Oklahoma conditions" did not contemplate this reason for dismissal.

Defendant further states that plaintiff was dismissed from his subsequent position with Atlantic for reasons of insubordination.

### FINDINGS OF FACT

Atlantic operates carrier properties under a lease from the Atlantic and North Carolina Railroad Company, the lease expiring in 1994. The Atlantic interests extend from Goldsboro, North Carolina, to Morehead City, North Carolina, an Atlantic Ocean port. This is an operation extending over a distance of some ninety-six miles.

On October 22, 1954, Southern filed a petition with the Interstate Commerce Commission wherein it sought to acquire control of Atlantic and its leasehold interests. This seeking of control of Atlantic was to be accomplished through the acquisition of Atlantic's capital stock. Approval of the acquisition was sought by the parties pursuant to the provisions of Section 5(2) of the Interstate Commerce Act, Title 49 U.S.C.A. Sec. 5(2).

Section 5(2) of the Act provides in pertinent parts:

"*Unifications, mergers, and acquisitions of control.*

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or * * * to acquire control of another through ownership of its stock or otherwise . . . or

\*     \*     \*     \*     \*

"(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, * * *."

This acquisition through purchase of stock was ultimately approved by the Interstate Commerce Commission on September 19, 1957. Certain prescribed conditions for the protection of the interests of Atlantic employees who might be adversely affected as a result of the acquisition were imposed upon Southern, as required by the above-stated statute. The effective date of the Commission's Order allowing the acquisition was February 27, 1957.

Subsequently, by a Supplemental Order dated September 29, 1958, the Commission replaced the employee protective provisions it had originally imposed, and which were known as the "Northwestern Conditions" (from Chicago N. W. Ry. Co. Merger, 261 I.C.C. 672 (1946)), with conditions the Commission had imposed in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (1944), and known as the "Oklahoma conditions."

"4. If, as a result of the abandonment of operation herein permitted and the purchases et cetera, herein authorized, hereinafter referred to as the transaction, any employee * * * is displaced, that is, placed in a worse position with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced. The latter compensation is to be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12 months in which he per-

formed services immediately preceding the date of his displacement as a result of this transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). If his compensation in his retained position in any month is less than the aforesaid average compensation in the test period, he shall be paid the difference, less compensation at the rate of the position from which he was displaced for time lost on account of his voluntary absences in his retained or current position, but if in his retained position he works in any month in excess of the average monthly time paid for in the test period, he shall be compensated for the excess time at the rate of pay of the retained position; provided, however, that nothing herein shall operate to affect in any respect the retirement on pension or annuity rights and privileges in respect of any employee; provided, further, that if any employee elects not to exercise his seniority rights he shall be entitled to no allowance, * * *. The period during which this protection is to be given, hereinafter called the protective period, shall extend from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein; * * *.

"5. If, as a result of the transaction herein approved, any employee, hereinafter referred to as a dismissed employee, of the carriers is deprived of employment with said carriers because of the abolition of his position or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as result of the transaction herein approved, he shall be accorded a monthly dismissal allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of this transaction. This allowance shall be made during the protective period to each

dismissed employee while unemployed, * * *.

"The dismissal allowance of any dismissed employee who is otherwise employed shall be reduced to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his representative, and the carriers, should agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

"The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for which he is eligible, or in the event of his resignation, death, retirement on pension, or dismissal for good cause."

Plaintiff was continuously employed by Atlantic from November 8, 1949, until October 4, 1957, a period of eight (8) years. His position was that of a diesel mechanic helper, and it was abolished by Atlantic along with several other jobs in the Maintenance and Equipment Department.

After Southern's acquisition of Atlantic, new procedures for maintenance of engines and cars were devised. A loan and rotation system of diesel engines with Southern was established, which resulted in major maintenance being performed by Southern in its own shops.

Southern placed its employees in managerial positions at Atlantic's yard in New Bern. It closed up one shop and had new and more efficient repair machinery installed in the remaining shop. Atlantic's older machinery was sold and disposed of, and the Atlantic work force was materially diminished as a result of these steps taken under Southern's new

management. The nature of maintenance performed in the Atlantic yard at New Bern, as well as the quantity, was altered materially as a result of the changes in procedures and equipment instigated by Southern.

Plaintiff was one of those employees released by Atlantic as a result of the changes in procedure and equipment. He was not offered nor advised by Atlantic, upon being discharged, of any further possible railroad employment possibilities.

Plaintiff, however, shortly thereafter obtained a new position of employment with Atlantic. This was a position as a spike-puller with a labor gang working out of Morehead City, rather than out of New Bern. This position was obtained by plaintiff on his own initiative and without the assistance of officials of either Atlantic or Southern. His wage rate was lower than that previously received by him as a diesel mechanic helper.

Plaintiff had never performed work as a spike-puller and was, therefore, just beginning to become accomplished in his new position when he was discharged. The job required plaintiff to manually push a 1,000-pound car along railroad tracks while a power-driven device removed the railroad spikes from the wooden cross-ties. The spike-puller and the machine proceeded along the railroad tracks, preceding the rest of the labor gang.

In the latter part of plaintiff's first week on the new job, he was directed to remove the 1,000-pound car from the tracks in order to permit a train to pass. A few men were sent to assist him by a Mr. Tindall, his foreman. Plaintiff replied, telling his supervisor to wait, as follows: "Wait a God damn minute." (Tr. p. 199)

Foreman Tindall immediately discharged plaintiff, but then reconsidered and he was given "the second chance." Plaintiff was thereupon directed to again remove the spike-puller, and his reply was, "Wait a damn minute until I get ready." Upon these two exclamations, plaintiff, an employee of eight years, was permanently discharged for insubordination.

## CONCLUSIONS OF LAW

■ Plaintiff was an employee of Atlantic within the meaning of the "Oklahoma conditions" which were imposed upon Southern by the Order of the Commission, according to the provisions of Section 5(2) (f) of the Act. It is further conceded by Southern that his job with Atlantic was abolished after the acquisition.

■ The further contention of defendant that the abolition of plaintiff's position was the result of reasons and causes other than those specified in the Order of the Commission is untenable. It is clear that, but for the acquisition of Atlantic by Southern, the changes in procedures and equipment would not have resulted. This case is, therefore, controlled by law enunciated in the case of Gillikin v. Atlantic & E. C. Ry. Co., 255 N.C. 228, 120 S.E.2d 847 (1961).

■ Defendant's further contention relating to plaintiff's subsequent employment is of no relevance to the question of the application of the "Oklahoma conditions."

Defendant did not provide him with that latter position upon his being discharged from his former position. He obtained the position of spike-puller upon his own initiative, and his discharge therefrom should be examined in a manner as if plaintiff had found work with an employer totally unrelated to railroading.

■ Section 5(2) (f) was designed to protect Atlantic's employees from being put "in a worse position with respect to their employment" as a result of the acquisition. Even upon obtaining his new position with Atlantic, plaintiff remained in a worse position and thereby entitled to relief according to the "Oklahoma conditions." Not only was he receiving less pay, but he was unable to improve his status through the exercise of seniority rights. He was, therefore, entitled to a "monthly displacement al-

lowance." (See the "Oklahoma conditions," paragraph #4.) According to the "Oklahoma conditions," the relevancy of the nature of plaintiff's second position with Atlantic and his discharge would go, therefore, only to the question of mitigation of damages.

■ Plaintiff deducted from his claim for a recovery that amount earned as a spike-puller. The fact that he may have been discharged for insubordination also goes to the issue of mitigation.

■ When considering the nature of plaintiff's discharge, the Court notes the facts and will draw inferences therefrom. Johnson v. Branch, 242 F.Supp. 721, 731 (E.D.N.C.1965). In this case, plaintiff, who had for eight continuous years performed fully and satisfactorily for Atlantic in its yards and shops in New Bern, was placed in a new and difficult job. He was now out in the field. He was working in unfamiliar surroundings, at an unfamiliar position, for a new boss whose interests were new to plaintiff.

■ The nature of the comments for which plaintiff was supposedly discharged were not personal. He did not challenge Mr. Tindall's authority, nor did he defy him. He did use profanity, but surely a railroad labor gang foreman was not unduly shocked or offended at this. Yet, this foreman saw fit to immediately discharge plaintiff. One cannot help but notice the extreme and rapid response of the foreman in discharging plaintiff. At any rate, the grounds for discharge are trivial and unwarranted.

■ For these reasons, the Court is impressed that plaintiff mitigated damages fully by obtaining the new position with Atlantic. If the plaintiff's discharge for insubordination should be considered grounds for nullifying entitlement to benefits under the "Oklahoma conditions," the Court concludes the discharge was unwarranted and in violation of the purpose and intent of Section 5(2) (f) of the Act.

■ The Commission must "require a fair and equitable arrangement to protect the interests of the railroad em-

ployees affected." (Sec. 5(2) (f)) It has done so through implementation of the "Oklahoma conditions." Defendant will not be allowed to defeat the clear intent of the Act by guise and indirection.

### ORDER

Therefore, it is ordered that plaintiff's prayer for monetary relief be, and the same is hereby allowed.