Winslow M. **EDWARDS**, Appellee,

v.

**SOUTHERN RAILWAY COMPANY,**
Appellant.

**C. B. TAYLOR**, Appellee,

v.

**SOUTHERN RAILWAY COMPANY,**
Appellant.

Charlie **SHEPPARD**, Appellee,

v.

**SOUTHERN RAILWAY COMPANY,**
Appellant.

Nos. 10869, 10870, 10873.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 7, 1967.

Decided April 3, 1967.

---

Jerome Ackerman, Washington, D. C. (John S. Koch, W. Graham Claytor, Jr., James I. Hardy, Washington, D. C., William T. Joyner, Raleigh, N. C., and Thomas J. White, Kinston, N. C., and Covington & Burling, Washington, D. C., on the brief), for appellant.

Thomas B. Griffin, Kinston, N. C. (W. Olin Reed, Kinston, N. C., on the brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BELL* and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Southern Railway appeals from the award of benefits to three former em-

* Judge J. Spencer Bell voted in conference in accordance with the disposition of the appeals made herein, but his death on March 19, 1967, prevented his participation in the preparation of this opinion.

ployees [1] of the Atlantic and East Carolina Railway (A&EC) under job security provisions imposed upon Southern by the Interstate Commerce Commission [2] as a condition of assuming control of the A&EC. The appellees were discharged following Southern's acquisition of the A&EC in September 1957.

The only question raised in these appeals is whether the district judge correctly applied the job security provisions. Pertinent parts of the provisions follow:

"4. If, as a result of the * * * [acquisition herein approved] any employee of * * * the carriers is *displaced,* that is, placed in a worse postion with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules, and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall be paid a *monthly displacement allow-ance* equal to the difference between the monthly compensation received by him in the position in which he is retained and the [average] monthly compensation received by him [during the last 12 months] in the position from which he was displaced. * * If his compensation in his retained position in any month is less than the aforesaid average compensation in the test period, he shall be paid the difference * * *; provided, however, * * * that if any employee elects not to exercise his seniority rights he shall be entitled to no allowance, * * *. The period during which this protection is to be given, hereinafter called the protective period, shall extend from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein; * * *.

"5. If, as a result of the transaction herein approved, any employee, hereinafter referred to as a *dismissed employee,* of the carriers is deprived of employment with said carriers because of the abolition of his position * * as a result of the transaction herein approved, he shall be accorded a monthly dismissal allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of this transaction. This allowance shall be made during the protective period to each dismissed employee while unemployed, * * *.

"The dismissal allowance of any dismissed employee who is otherwise em-

1. The decisions of the district court in these cases are reported at Edwards v. Southern Ry. Co., 257 F.Supp. 451 (E.D. N.C.1966); Taylor v. Southern Ry., 258 F.Supp. 257 (E.D.N.C.1966); Sheppard v. Southern Ry., 258 F.Supp. 217 (E.D. N.C.1966).

2. Where one railroad is permitted to acquire control of a second railroad through ownership of its capital stock, as in the present case, the ICC is required by Section 5(2) (f) of the Interstate Commerce Act to impose employee protective conditions. Section 5(2) (f) reads:
   "As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order * * *."
   49 U.S.C.A. § 5(2) (f).

See generally Brotherhood of M.W.E. v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961).

ployed shall be reduced to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his representative, and the carriers, should agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

"The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for which he is eligible, or in the event of his resignation, death, retirement on pension, or dismissal for good cause." (Emphasis added.) [3]

### EDWARDS

■ Edwards was discharged after Southern's acquisition of the A&EC. The only issue presented for our consideration is whether the district court erred in treating him as an "employee" entitled to protection under the ICC order. We believe the district court was wrong in affording Edwards the benefit of the protective order and reverse its judgment in his favor.

Prior to Southern's assumption of control Edwards' father was General Manager, Chairman of the Board, and controlling stockholder of the small *family-owned* railroad. Edwards was himself a stockholder.

When discharged Edwards was Chief Engineer, a position designated in reports filed with the ICC and the North Carolina Utilities Commission as a general officer of the A&EC. Edwards served as advisor to his father and technical administrator with authority to execute the company budget and procure materials for track maintenance. He was responsible for the "Roadway Department" and supervised something over one-third of A&EC's approximately one hundred and seventy employees. Edwards was not a union member and his position was not covered by any collective bargaining agreement.

■ Neither the Interstate Commerce Commission nor the "Oklahoma conditions" imposed by the ICC provide a definition of "employee." We believe, however, that "employee" as used in the present context by Congress and the ICC surely does not include the principal managers of a railroad who ordinarily are in a position to protect themselves from the consequences of consolidation.[4] Edwards occupied in the small family-owned railroad an important managerial position and, moreover, stood in a unique personal relationship to the controlling interests. We believe our decision that he is not entitled to the benefit of the protective order is supported by the legislative history of Section 5(2) (f) of

---

3. The provisions are from paragraphs 4 and 5 of the conditions first imposed in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (1944), and generally referred to as the "Oklahoma conditions."

4. One federal district court considering ICC job protection provisions has ruled that "employees" encompasses persons "(including subordinate officials) covered by, or subject to, collective bargaining agreements under the Railway Labor Act" but not, *inter alia*, "officers," or "department heads, and those in the next echelon, such as assistants and staff members to the department heads."
In the Matter of Florida E.C. Ry., No. 4827-J, S.D.Fla., January 5, 1960.

In a 1954 unreported opinion, Judge Skelly Wright concluded that the legislative history of Section 5(2) (f) of the Interstate Commerce Act "leaves no doubt that the term 'employee' as used therein does not include the vice-president and general manager of a railroad. * * * Nor does the every day meaning of the word 'employee' * * *." See McDow v. Louisiana S. Ry., 219 F.2d 650, 652 & n. 1 (5th Cir. 1955).

the Interstate Commerce Act [5] and by other relevant railroad law. [6]

## TAYLOR

█ Taylor was discharged from the position of car inspector and repairman in which he had served ten years. Counsel agree that the sole question presented is whether the discharge was the "result" of the consolidation in the sense *result* is used in Section 5(2) (f) and the employee protective conditions. [7] We cannot say that the district court was clearly erroneous in determining that Taylor's discharge did "result" from Southern's acquisition.

Taylor's responsibilities had entailed inspecting railroad cars for defects when they came into the A&EC yards in New Bern. He would repair some in the yards and tag others which were then sent to the A&EC shops. Taylor also assisted in making up trains and did "little odds and ends."

When Southern acquired the A&EC the duties of car inspector were changed so as to require the ability to operate a derrick on a flat car or drive a truck with portable repair equipment. This enabled the car inspector to make repairs in the field along the ninety-six-mile railroad. Taylor was offered his former position as redefined by Southern but was unable to qualify because of the inability to operate a derrick or drive a truck. [8] The railroad did not offer him any other employment.

The district court concluded that Southern had effectively abolished the car inspector position *in the New Bern yard*. It found that "[t]he nature of the position had materially changed" and now "bears little resemblance to that position from which changes took place * * *."

Southern argues that Taylor's job was not eliminated but its duties expanded to promote efficiency by making car re-

---

5. Consideration by Congress of employee protective measures was in terms of aiding railroad "labor" ("workers," those "who toil," and those belonging to unions). See, e. g., discussion by George H. Harrison in Hearings Before Senate Committee on Interstate Commerce on the Transportation Act of 1940, 76th Cong., 1st Sess. at 34 (1939) and debate at 84 Cong.Rec. 9881–7 (1939).

6. Employee is defined in Section 1 of the Railway Labor Act, 45 U.S.C.A. § 151 (Fifth), to include "every person in the service of a carrier * * * who performs any work defined as that of an *employee or subordinate official* in the orders of the * * * " ICC. (Emphasis added.) We think it clear that Edwards carried sufficient responsibilities, especially considered against the background of immediate family relationship, to remove him from the category of subordinate official. In Beeler v. Chicago R.I. & P. Ry., 169 F.2d 557 (10th Cir. 1948), cert denied, 335 U.S. 903, 69 S.Ct. 407, 93 L.Ed. 437 (1949), the Tenth Circuit held that an agent-yardmaster was an official—as distinguished from a "subordinate official"—and therefore not an "employee" within the Railway Labor Act definition.

Our decision that Edwards is not an "employee" is in accord with the principles laid down in the ICC decision cited by the district court. In the Matter of Regs. Concerning the Class of Employees and Subordinate Officials to Be Included Within the Term "Employee" Under the Railway Labor Act, 266 I.C.C. 85 (1946). The ICC, holding that certain subordinate officials, including general roadmasters and foremen and supervisors and inspectors of signals, were "employees" under the Railway Labor Act, stated that:

"in the final analysis rank and title are not controlling in defining the work of subordinate officials, and we are unable to conclude that there is any fixed outstanding factor which will always control, without exception. We do not believe that as a practical matter it is feasible to make a definite line of demarcation between the work of subordinate officials and that of officials. * * * Each proceeding, therefore, must of necessity be decided upon the record * * *." Supra, 266 I.C.C. at 92.

7. Protection is afforded by the terms of the Interstate Commerce Act and the "Oklahoma conditions" only when discharge is the *"result"* of the transaction which has gained ICC approval.

8. Taylor, who was sixty-three at the time of acquisition, testified that he had never owned a truck or car and had never driven a car—with the exception of a motor car on the railroad.

pairs in the field. Southern does not contend that this was an "economy measure which had begun before Southern's acquisition and expanded thereafter," as was found to be the cause for displacement of section laborers and clerks in Swacker v. Southern Ry., 360 F.2d 420, 428 (4th Cir.), cert. denied, 385 U.S. 837, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966). Southern asserts only that the new methods of car repair *could have been* instituted before as well as after the acquisition.

It is again unnecessary to reach the question expressly left open in *Swacker*: whether ICC protective conditions may benefit employees dismissed because of the adoption of technological improvements or economy measures after acquisition of control. 360 F.2d at 428.[9] We think that the evidence in the present record will support the inference that the requirements of Taylor's job were altered as a consequence of the redistribution of functions between the A&EC and the Southern after the change of ownership.[10]

Moreover, there is no question that but for Southern's acquisition of the A&EC Taylor would have retained his job. He could not meet the requirements of car inspector as redefined, and Southern failed to offer him alternative employment for which he could qualify. Taylor was placed in "a worse position" in respect to his employment. We affirm the judgment of the district court in favor of Taylor.

## SHEPPARD

Southern concedes that when separated from his position as diesel mechanic's helper Sheppard was entitled to collect the dismissal allowance provided for in paragraph five of the "Oklahoma conditions." The present question is whether Sheppard's subsequent conduct deprives him of the right to the dismissal

---

9. The district court in *Swacker* quoted with approval the following from a pertinent ICC ruling:

> "the 'effect' of subsequent internal technological improvements by either of the [two consolidating] carriers, even if made possible by improved financial circumstances partly attributable to the unification of control, is too indirect and remote to be considered a *result of the transaction;* and it is not our intention that employees affected by such internal improvements shall be entitled to the benefit of the conditions." Southern Ry.—Control—Central of Georgia Ry., 317 I.C.C. 729, 732 (1963), aff'd sub nom. Railway Labor Executives Ass'n v. United States, 226 F.Supp. 521 (E.D.Va.), vacated on other grounds, 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964) (Emphasis added.)

Compare Gillikin v. Atlantic & E.C. Ry. Co., 255 N.C. 228, 243, 120 S.E.2d 847, 857 (1961), where Chief Justice Parker states that a discharged employee would be entitled to the protection of the same ICC order as involved in the present case "even though [his] * * * job was abolished because of modernization of equipment or improved facilities by Southern, the purchasing railroad."

10. Aside from the record in the present case, and although unnecessary to our decision, we note that in the companion case of Sheppard v. Southern Ry., which was tried together with the instant action, the district judge found the following facts:

> "After Southern's acquisition of Atlantic [A&EC], new procedures for maintenance of engines and cars were devised. A loan and rotation system of diesel engines with Southern was established, which resulted in major maintenance being performed by Southern in its own shops.
> "Southern placed its employees in managerial positions at Atlantic's yard in New Bern. It closed up one shop and had new and more efficient repair machinery installed in the remaining shop. Atlantic's older machinery was sold and disposed of, and the Atlantic work force was materially diminished as a result of these steps taken under Southern's new management. *The nature of maintenance performed in the Atlantic yard at New Bern, as well as the quantity, was altered materially as a result of the changes in procedures and equipment instigated by Southern.*" 258 F. Supp. 217, 221 (E.D.N.C.1966). (Emphasis added.)

See in addition findings in Kehoe v. Southern Ry. Co., 258 F.Supp. 245, 249 (E.D.N.C.1966); Gillikin v. Atlantic & E. C. Ry. Co., 255 N.C. 228, 243, 120 S.E. 2d 847, 857 (1961).

allowance during the four year protective period.

Southern did not offer or advise Sheppard of other railroad employment upon his release following the change in A&EC ownership. Soon after his discharge, Sheppard learned from an independent source of an open job as spike puller with an A&EC labor gang out of Morehead City. He had worked out of New Bern while a diesel mechanic's helper. ·Southern admits that Sheppard sought and obtained the open position on his own initiative. Sheppard's new employment required different skills than his old job and paid him a lower wage rate.

Sheppard was discharged from the new position as spike puller after only a week because of his intemperate protest[11] when asked to assist in lifting a half-ton motor car from the tracks.

 We believe the district court was correct in treating Sheppard's employment as a spike puller "in a manner as if [he] * * * had found work with an employer totally unrelated to railroading."[12] It was, therefore, unnecessary to determine whether Sheppard's second dismissal was for good cause.

We interpret the "Oklahoma conditions" to mean that an employee is not "retained" in a position—and thus *displaced* as opposed to *dismissed*—unless retained at the instance of the railroad. We think that displacement conditions should not be substituted for dismissal conditions except where an employee receives an offer from the railroad to continue in or return to a new position for which he is qualified. Sheppard's second discharge may or may not have resulted from his inability to perform the new work he attempted. Such inability could well account for insubordination and intemperance of language. We need not decide—because he was not notified by the carrier of a position "the duties of which he [was] * *

qualified to perform."[13] Thus, Sheppard's obtaining a job as spike puller on his own initiative, as the district court thought, is analogous to a dismissed railroad worker unsuccessfully attempting work other than railroad employment. Such a situation is within the scope and purpose of the dismissal benefits accorded under the Act.

Whether the second dismissal was for cause in the sense that Sheppard could not do the work or for cause in the sense of insubordination, we think the district court rightly adjudged that he lost his job *as a diesel mechanic's helper* as a result of the acquisition of the A&EC by Southern. Southern is, of course, entitled to reduce the compensation owing to Sheppard by the amount of his temporary earnings—whether as a spike puller with the A&EC or in other employment.

10,869, Reversed.

10,870, Affirmed.

10,873, Affirmed.

---

11. He said: "Wait a God damn minute."

12. Sheppard v. Southern Ry. Co., 258 F. Supp. 217, 222 (1966).

13. Oklahoma Conditions ¶ 5, supra.