Herman VOGEL, Appellee,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellant.**

No. 74–2112.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 4, 1975.

Decided April 8, 1976.

**14**

Peter J. Ciano, Washington, D. C., for appellant.

Philip F. Herrick, Washington, D. C., with whom Manuel J. Davis, Washington, D. C., was on the brief for appellee.

Before LUMBARD,* Senior Circuit Judge for the Second Circuit, WRIGHT and TAMM, Circuit Judges.

* Sitting by designation pursuant to Title 28, U.S. Code Section 292(d).

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this action defendant-appellant Washington Metropolitan Area Transit Authority ("WMATA") appeals from a district court judgment granting plaintiff-appellee, Herman Vogel (Vogel), a $10,000 bonus and $3,928.80 in severance pay. The appellant raises essentially the following issues on appeal: (1) whether the trial court erred in finding that the D.C. Transit System, Inc. and Vogel intended to extend the latter's written employment contract after its expiration in 1971 and that WMATA assumed this same contractual obligation in 1973; and (2) whether the trial court erred in granting Vogel a bonus of $10,000 and severance pay of $3,928.80.

Because we hold that the trial court correctly decided that Vogel's employment contract was extended and then assumed by WMATA, but erred in its computation of a bonus and incorrectly granted severance pay, we reverse in part and remand to the district court for the entry of a proper order.

## I. THE FACTUAL BACKGROUND

Vogel entered into a written employment contract with the D.C. Transit System, Inc. (Transit) on November 18, 1970. Vogel agreed to act as Director of Sales and Marketing in return for a yearly salary of $25,-000 and a bonus "equivalent to 2% of the Company's net completed sales in the Chartering and Sight-Seeing Department in excess of $2,500,000.00 for the period of this contract, including Chartering and Sight-Seeing of its affiliate, Washington, Virginia and Maryland Coach Co., Inc." The contract also provided that "[t]he bonus for the period of this contract is not to exceed in any event $10,000.00." Appendix at 17. Vogel was not entitled to receive any bonus if terminated for cause before the expira-

tion of the agreement on November 22, 1971. There also was an integration clause providing that the contract could not be modified, extended, or varied unless in writing and signed by both parties.

The problem here arose because Vogel continued to work in this capacity for Transit after November of 1971 without a written extension of his employment agreement. His salary remained the same and he received a $10,000 bonus in 1971 and 1972.

In January, 1973, WMATA acquired the Transit assets, including its employees, pursuant to the National Capital Area Transit Act of 1972. 86 Stat. 999. Vogel stayed on, working out of his office at 1422 New York Avenue. In February 1973 WMATA acquired the assets of Alexandria, Barcroft & Washington Transit Company ("AB&W") and WMA Transit Company (WMA). Vogel continued to direct all charter sales operations for WMATA.

WMATA moved its offices to L'Enfant Plaza in the spring of 1973. This move caused some confusion and handicapped the charter sales department because the new telephones were not functioning properly and there was no ready access to a copying machine. During this period, Vogel allegedly advocated a sickout to "teach the bastards a lesson." Record at 110, 135. He was greatly agitated because of the inartful move which hampered his sales operations. No employees, including Vogel, took sick leave at this time.

On June 22, 1973, Vogel and his superior, Mr. John Warrington, met to discuss Vogel's alleged remarks. Another meeting was held on July 2 at which Warrington verbally notified Vogel that he would be dismissed, effective July 16. Vogel's last day of employment with WMATA was in fact July 16. Because of some administrative oversight, however, he did not receive written notice of termination until August 20.

## II. PROCEEDINGS IN THE DISTRICT COURT

On November 9, 1973, Vogel filed a complaint in the District Court for the District of Columbia in which he sought to recover compensation for personal services. He demanded severance pay amounting to $4,893.20, overtime amounting to $1,248.00, and a bonus of $10,000.00. He later amended the complaint and raised his severance demand to $5,893.20.

After filing an answer, WMATA sought partial summary judgment as to the bonus claim. Vogel then cross-filed for a ruling on his severance pay and overtime claims.[1]

By a memorandum-order of June 18, 1974, the district court granted summary judgment in WMATA's favor as to the overtime count only. The other two counts went to trial on September 23, and on October 23, 1974, the trial judge issued his decision specifically finding that Vogel's contract had been extended after 1971 and that WMATA had assumed all of its obligations in 1973. It is unclear whether the trial court found that the plaintiff had made the alleged "sickout" remarks but it did find that even if such remarks had been made, they did not constitute cause for dismissal. The court allowed Vogel severance pay in the amount of $3,928.80 based on company policy and a bonus of $10,000 based on the total charter sales through August of 1973.

## III. VOGEL'S EMPLOYMENT CONTRACT WAS EXTENDED AND SUBSEQUENTLY ASSUMED BY WMATA

It is widely accepted that where parties enter into a contract of employment for a term of one year, and then continue the relationship without a new agreement, they are presumed to have renewed the original contract for another year. *See, e. g., Spencer v. General Electric Co.*, 243 F.2d 934 (8th Cir. 1957); *Patent & Licensing Corp. v. Olsen*, 188 F.2d 522 (2d Cir. 1951); *Hines v. Ward Baking Co.*, 155 F.2d 257

---

1. On May 20, 1974, WMATA amended its motion to include all three counts of the amended complaint.

(7th Cir. 1946). Because WMATA failed to rebut this presumption, the district court correctly found that Vogel's contract was extended by Transit. The district court further found as a fact that WMATA and Vogel intended that this contract be continuing in effect in all of its provisions. There is ample evidence in the record to support this conclusion. *See* D.C.Code § 1–1431 note (Supp.1975). We therefore cannot find this ruling clearly erroneous and must affirm it. *Case v. Morrisette*, 155 U.S.App. D.C. 31, 475 F.2d 1300 (1973).

### IV. VOGEL IS ENTITLED TO A BONUS

■ As a preliminary matter, we must deal with WMATA's contention that it contravenes public policy for a public employee to receive a bonus. We conclude that public policy does not preclude a bonus in the situation presented here. The government awards commissions, incentive awards, and bonuses to public employees in many different capacities. *See, e. g.,* 5 U.S.C. §§ 4501–06 (1967) (cash awards to civil service employees for superior accomplishments, suggestions, inventions); 10 U.S.C § 1124 (1975) (cash award or honorary recognition of member of Armed Forces for contributing to the efficiency, economy, or other improvement of government operations); 32 C.F.R. § 15.205–06 (1974) (employees working under a defense contract are allowed bonuses).

■ The bonus sought here by Vogel is not contrary to public policy because the legislature has mandated it. Under subsection 66(e) of WMATA's compact it has the obligation to maintain all employee benefits so that no transferred employee is put in a worse position than he was in prior to his move to WMATA. D.C.Code § 1–1431 note (Supp.1975). Vogel would be penalized by WMATA's take-over if he could no longer receive a bonus. We therefore conclude that his right to a bonus must be preserved in order to carry out the legislature's ex-

pressed desire. *See generally Davis v. Commonwealth,* 164 Mass. 241, 41 N.E. 292 (1895).

■ We next must decide whether Vogel was discharged for cause and thus lost his right to a bonus under the terms of his contract, *i. e.,* whether advocating a sickout "to teach those bastards a lesson," spoken by a greatly agitated employee, warrants his dismissal. These words, in the context of the move which disrupted the smooth functioning of Vogel's department, do not meet the standards for discharge for cause. The following case illustrates this view.[2]

In *Johns v. S. H. Kress & Co.,* 78 Idaho 544, 307 P.2d 217 (1957), an employee refused to work on a legal holiday, and the court had to determine whether her subsequent dismissal constituted a discharge for misconduct. In defining "discharge for misconduct" the court found that this term

> should be interpreted as meaning wilful, intentional disregard of the employer's interest; a deliberate violation of the employer's rules; or a disregard of standards of behavior which the employer has a right to expect of his employees.

307 P.2d at 219.

■ Vogel's conduct cannot be said to meet this standard. He spoke out because he was annoyed that his employer's business was being disrupted during its busiest season by the confusion generated by the move. It is clear from the record that Vogel maintained a strict view of the company's sick leave policy with those under his supervision and that his outburst did not cause any employee to violate the company's sick leave policy. Record at 77, 87, 125–28. The use of one profane word, taken in context, cannot be escalated to constitute a flagrant violation of the company's standard of behavior. Employer-employee disputes are often spiced with a little profanity, but this does not establish just cause for dismissal. *NLRB v. Cement Transport,* 490 F.2d 1024 (6th Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974);

---

**2.** It is also important to note that these words apparently were not taken seriously by anyone but Vogel's superiors because none of the employees took sick leave pursuant to Vogel's supposed suggestion.

*Sheppard v. Southern Railway Co.*, 258 F.Supp. 217 (E.D.N.C.1966); *aff'd sub nom. Edwards v. Southern Railway Co.*, 376 F.2d 665 (4th Cir. 1967).

■ Having established Vogel's right to a bonus, we now turn to the question of *how much* of a bonus he should receive. For this we must look to the amount of the charter sales and to Vogel's period of service in 1973. Vogel admits receiving oral notice of his termination on July 2, 1973. Record at 47. His last day of work for WMATA was July 16, 1973. Record at 217. He began work for a different employer on August 1, 1973. We therefore find that he is equitably estopped by his admissions and actions from relying on WMATA's failure to give him written notice of termination until August 20. *See* 31 C.J.S. *Estoppel* § 108 (1964). There is also a question as to whether the total charter sales should include those sales from the former AB&W and WMA lines which WMATA acquired early in 1973. It is evident that Vogel handled the charter sales operations for *all* of the companies acquired by WMATA. Even the accounts of the four companies were consolidated by WMATA so that there is no precise record of the sales attributable to each line. Only one employee was added to the charter sales division after the last two companies were acquired and he did not handle the sales aspect of the operation. Record at 77, 85.

■ In order to compute the amount of the bonus, we must therefore determine the total WMATA charter sales from all four acquired companies from January through July 16, 1973. Based on the figures submitted in the parties' pleadings, we find the following total monthly sales:

| | |
|---|---|
| January | $147,579 |
| February | 181,202 |
| March | 266,696 |
| April | 690,462 |
| May | 565,556 |
| June | 501,094 |
| July 1–16 | 224,045 |

Therefore the total charter sales from January through July 16, 1973, were $2,576,634.

Under the language of the employment contract, Vogel is entitled to 2% of the excess over $2,500,000, the excess here being $76,634. This means he should receive a bonus amounting to $1,532.68.

## V. VOGEL IS NOT ENTITLED TO SEVERANCE PAY

■ The company policy regarding severance pay is clearly outlined in its "Employee Handbook." Plaintiff's Exhibit No. 2 at 24–25. Four paragraphs in this Handbook are applicable here.[3] The first paragraph deals with persons voluntarily separated from the company and states that they do not receive severance pay. The next sec-

---

3. "Employees leaving the Authority voluntarily should give at least two weeks notice of intention to do so. Such resignations are accepted without prejudice, and employees are paid for all recorded overtime and unused annual leave to their credit. They do not receive severance pay.

Separation from the Authority resulting from disciplinary action carries with it the stigma of prejudice, an indication that the employee will not be rehired. Formal notification of dismissal normally will be given the employee at least two weeks before the intended effective date, and will specify the reasons for the action and advise the employee of his rights under the circumstances. Upon receipt of such notice, the employee may informally appeal the matter to his supervisor, the Office Director or the General Manager. Permanent employees may avail themselves of the grievance procedure on a formal basis.

Employees may have to be separated from the Authority if changes occur in workload, in the way certain kinds of work are performed, or if available funds become too restricted to permit financing the work at its current level. Any employee to be laid off shall receive notice at least two weeks before the effective date. A permanent employee who believes he has been unfairly selected for lay-off may avail himself of his rights under the grievance procedure.

Employees laid off shall be paid for their accumulated annual leave, any uncompensated overtime, and severance pay equivalent to one month's salary at the current salary for each full year of service with the Authority to a maximum limit of three months. Temporary employees will receive pay only for any uncompensated overtime and unused annual leave." Plaintiff's Exhibit No. 2 at 24–25.

tion speaks of dismissed employees and fails to mention severance pay. The third paragraph refers to the rights and grievance procedures available to employees who are laid off. Severance pay is not mentioned. The following paragraph elucidates what benefits a laid off employee has a right to expect. Severance pay is one of those benefits listed. We believe the Handbook clearly indicates that only those persons separated from WMATA due to a reduction in force are eligible for severance pay, and those who leave voluntarily or are dismissed are not. We must enforce the plain, clear, unambiguous language as set forth in the Handbook. *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Vogel was not laid off but was dismissed, and therefore is not entitled to any severance pay.

## VI. CONCLUSION

For the foregoing reasons, we remand this case to the district court for entry of an order granting Vogel a bonus in the amount of $1,532.68 but denying him severance pay.

*So ordered.*